**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Philip A. Brimmer**

Civil Case No. 09-cv-01019-PAB-KMT

TAISSIYA OLEYNIKOVA,

    Plaintiff,

v.

KAREN L. BEYE, in her official capacity,
GALINA KRIVORUK, in her individual capacity, and
RONALD OZGA, in his individual capacity,

    Defendants.

_____

**ORDER GRANTING SUMMARY JUDGMENT**
_____

This matter is before the Court on the motion for summary judgment [Docket No. 61] filed by defendants Beye, Krivoruk and Ozga. Defendants seek dismissal of plaintiff's claims against them for abridgment of first amendment freedom of speech and age discrimination. The motion is fully briefed and ripe for disposition.

**I. JURISDICTION**

Plaintiff asserts claims under the First Amendment of the United States Constitution and the federal Age Discrimination in Employment Act ("ADEA"). Therefore, the Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

**II. BACKGROUND**[1]

Plaintiff Taissiya Oleynikova began working for the Colorado Department of Human Services ("CDHS"), Office of Information Technology Services ("OITS") on May

---

[1] Unless otherwise indicated, the following facts are not in dispute.

17, 1999.  Plaintiff was born on January 21, 1947 and was 52 years old when hired. Plaintiff initially worked as an Application Programmer I, but in 2006 her position was reallocated upward to an Information Technology Professional I ("ITP-1").  At CDHS, employees can go through a "reallocation" process, wherein their position is reclassified at a higher level.  The reallocation of a position is determined by analyzing a Position Description Questionnaire ("PDQ") which includes descriptions of the employee's job duties and requirements.  Plaintiff's chain of supervision at CDHS from 2005 through 2007 included her immediate supervisor Chuck Chow, defendant Galina Krivoruk, defendant Ronald Ozga (Deputy Chief Information Officer), and Ronald Huston (Chief Information Officer).  In 2007, Bruce Rensel became plaintiff's immediate supervisor, who reports to Van Head, Ms. Krivoruk (now Applications Director), and Mr. Ozga (now Chief Information Officer).

In 2005, Ms. Krivoruk supervised the work of an independent contractor named Meggin Bennabhaktula.  Ms. Bennabhaktula's husband also worked at OITS and reported to Ms. Krivoruk.  In March 2005, Ms. Bennabhaktula reported to Ms. Krivoruk that she felt her work was being "sabotaged" by Mr. Chow and she was not being properly supported by the configuration management team, which included Mr. Chow and plaintiff.  On April 4, 2005, Ms. Krivoruk spoke to Mr. Chow, who complained that Ms. Bennabhaktula was not doing her work as required under the contract and called Ms. Bennabhaktula a liar.  Ms. Krivoruk then met with Ms. Bennabhaktula and Mr. Chow to discuss these issues.  The issues were not resolved during the meeting and afterward Mr. Chow cut off Ms. Bennabhaktula's electronic access to the OITS network. Ms. Krivoruk then spoke with Mr. Chow about restoring Ms. Bennabhaktula's access

and Mr. Chow refused to do so. Ms. Krivoruk felt threatened by Mr. Chow during this conversation.

After her conversation with Mr. Chow, Ms. Krivoruk called plaintiff to discuss the situation. The two discussed Ms. Krivoruk's feeling threatened by Mr. Chow. Plaintiff told Ms. Krivoruk that this was surprising and that she did not believe Mr. Chow would threaten Ms. Krivoruk. Ms. Krivoruk claims that she and plaintiff did not discuss Ms. Bennabhaktula whatsoever during this conversation; however, plaintiff claims she and Ms. Krivoruk discussed Ms. Bennabhaktula at length. Plaintiff recalls that during this conversation she also told Ms. Krivoruk that Ms. Bennabhaktula was not performing under her contract and that continuing to pay Ms. Bennabhaktula was a waste of public money. Plaintiff claims her opinion on the issue upset Ms. Krivoruk and that, at the end of the conversation, Ms. Krivoruk told her to "stay out of" the situation. Docket No. 62-1 at 9 (Pl. Dep. at 20:6-9). On April 25, 2005, plaintiff sent an email to Ms. Krivoruk stating that plaintiff felt "insulted by" Ms. Bennabhaktula, requesting an apology from Ms. Bennabhaktula and describing Ms. Bennabhaktula as "a dishornest [sic] person with no dignity." Docket No. 61-15.

In 2005, plaintiff also began requesting that her position be reallocated upward to an Information Technology Professional II ("ITP-2"). Mr. Chow recalls that Ms. Krivoruk initially asked him to begin preparing a PDQ for plaintiff to be reallocated to an ITP-2 position. Mr. Chow and plaintiff prepared and submitted drafts of plaintiff's PDQ listing plaintiff's job position and duties at that level. On May 11, 2005, Ms. Krivoruk emailed Mr. Chow to say that her priorities were to fill new positions and to work on promotions for employees who had been waiting longer, but that she would "keep progress" on

plaintiff's "promotion." Docket No. 62-22. Over the next several months, plaintiff and Mr. Chow submitted a series of revisions to plaintiff's PDQ, each of which was returned for further revisions by either Mr. Ozga or Ms. Krivoruk.

On October 14, 2005, plaintiff met with Mr. Huston, Mr. Ozga, Ms. Krivoruk, and Mr. Chow to discuss her job duties and her reallocation. Plaintiff claims she told her supervisors that she felt retaliated against because she had not sided with Ms. Krivoruk during her dispute with Mr. Chow over Ms. Bennabhaktula's work. Plaintiff also recalls stating that continuing to employ Ms. Bennabhaktula as a contractor was a waste of money. Plaintiff did not ask Mr. Huston or Mr. Ozga to do anything about Ms. Bennabhaktula's contract or investigate it, but believed that the contract should be investigated.

At the end of 2005, plaintiff and Mr. Chow submitted a final revision of plaintiff's PDQ to Mr. Ozga and Ms. Krivoruk for review. The PDQ sought a reallocation of plaintiff's position to an ITP-2 level. On January 19, 2006, Mr. Ozga signed the PDQ and submitted it to CDHS's department of human resources, but changed the position requested to ITP-1. Mr. Ozga believed that, at the time, plaintiff's position should be allocated to an ITP-1 level based on the job duties plaintiff performed. On February 14, 2006, CDHS HR employee Carol Stahlberg emailed Ms. Krivoruk, advising her that the job descriptions on the PDQ submitted by Mr. Ozga resulted in the position qualifying as an ITP-2 level. Ms. Stahlberg's email additionally stated, "I can provide recommendations to tone it down so that it can be an IT Pro I as planned. Or we can keep it as an IT Pro II, but will she qualify for this?" Docket No. 62-30. After this email, Mr. Ozga revised the PDQ to remove certain job functions from plaintiff's job

4

description, including that the position mentored developers and analyzed upgrades to the system.  Docket Nos. 61-12, ¶ 20; 62-27 at 10-11.  Mr. Ozga signed and submitted the revised PDQ, and plaintiff was reallocated to an ITP-1 position with a salary increase.

In March 2006, plaintiff contacted CDHS's Civil Rights Unit to discuss her being classified to an ITP-1 position instead of ITP-2.  Her written complaint stated that she had been working in a hostile and stressful work environment as a result of her siding with Mr. Chow in his dispute with Ms. Krivoruk.  Plaintiff also discussed her belief that she was being discriminated against by Ms. Krivoruk because of her age and marital status.  On April 28, 2006, plaintiff met with Ms. Krivoruk, Mr. Ozga, and Mr. Huston.  At this meeting, plaintiff discussed her feeling that she was being retaliated against and her concern that her lack of promotion was going to affect her retirement.  Plaintiff complained again about Ms. Bennabhaktula's contract being a misuse of public money because of Ms. Bennabhaktula's poor performance.  On May 4, 2006, plaintiff met with Mr. Huston individually and discussed her concerns.

On August 26, 2006, plaintiff emailed Mr. Huston complaining about her reallocation and stating that she felt she was working in a hostile and stressful environment because she sided with Mr. Chow over Ms. Krivoruk.  Plaintiff also complained that she had been discriminated against by Ms. Krivoruk because of her age and marital status.  On September 7, 2006, plaintiff met again with Ms. Krivoruk, Mr. Huston, and Mr. Ozga to discuss these concerns.  At this meeting, Mr. Huston and plaintiff discussed her retirement plans.  On January 19, 2007, plaintiff wrote an email to CDHS' new executive director, Karen Beye, raising the same complaints.

On February 22, 2007, plaintiff told her new supervisor, Mr. Head, about what happened in 2005 with Ms. Krivoruk. Mr. Head claims that plaintiff did not mention Ms. Bennabhaktula in this conversation or the content of the dispute plaintiff had with Ms. Krivoruk. That same day, plaintiff met with Mr. Head and Mr. Rensel, her new Team Lead, to request a promotion. During the meeting, Mr. Head told plaintiff he did not intend to reallocate plaintiff's position from an ITP-1 to an ITP-2. Mr. Head also stated that there would be no reallocations generally for the group he supervised. At this meeting, plaintiff brought up the fact that her lack of promotion resulted in her losing money for her retirement and her concern that if she retired now, her pension would be small. Mr. Head then inquired about her retirement plans. On February 28, 2007, plaintiff met with Ms. Krivoruk and Mr. Head and they reiterated that plaintiff's position would not be reallocated. Plaintiff again raised the issue of her retirement pension.

On March 3, 3007, plaintiff met with Colorado State Department of Personnel and Administration ("DPA") Executive Director Rich Gonzales about her concerns. Following this meeting, plaintiff sent a memo detailing her concerns to DPA's State Personnel Rules Interpreter, Karen Schaefer. Ms. Schaefer responded to plaintiff in writing, indicating that she found Carol Stahlberg's 2006 email about toning down plaintiff's PDQ "troubling." Ms. Schaefer explained that, if the PDQ was unsigned and submitted for "informal" review, Ms. Stahlberg's email suggesting revision may have been appropriate; however, if the PDQ was signed and submitted for formal review, the position allocation resulting from its content should have been final. Docket No. 62-57. Ms. Schaefer recommended that human resources investigate plaintiff's 2006 allocation. On May 14, 2007, plaintiff wrote to Mr. Gonzales requesting a private

6

meeting with him to discuss her situation and issues that concerned her "as a taxpayer or just a Colorado resident." Docket No. 62-58. Sometime after Ms. Schaefer's report, plaintiff met with Mr. Gonzales and Jennifer Okes to discuss her concerns.

In the summer of 2007, DPA Consulting Services Supervisor Jennifer Clayman was assigned to plaintiff's case. On August 1, 2007, Ms. Clayman wrote an email to Mr. Gonzales and Ms. Okes stating that "our analysis is that her position reflects an IT Professional II, which is the upgrade she's requesting." Docket No. 62-59. Ms. Clayman advised Mr. Gonzales that she was working with the CDHS HR office to resolve the situation and would have their official position on the matter by the end of the week. Then, on August 2, 2007, Ms. Clayman wrote Mr. Gonzales again and indicated that despite her analysis,

> Kathy Depew on my team met with the CDHS HR analyst who did the classification, and Kathy was given some additional documentation which suggests [plaintiff's] position is properly classified as an IT Professional I. My concern is that at one point the pdq was revised to 'water down' the duties so it would not reflect an IT Pro II and I'm not sure whether the initial duties or the watered down version is the truth.

Docket No. 62-60. Ms. Clayman indicated her plan was to complete a "desk audit," wherein she visited plaintiff's work location to interview and observe her in order to determine the proper classification of her position.

On September 11, 2007, Ms. Depew, Ms. Clayman, and DHS HR employee Francine Hammer conducted a desk audit of plaintiff. The auditors met with Mr. Head, Ms. Krivoruk, and Mr. Rensel, and they also interviewed plaintiff and spent time observing plaintiff's job duties. When interviewing plaintiff's supervisors, Ms. Clayman did not ask about plaintiff's dispute with Ms. Krivoruk or her allegation that she had been

retaliated against. The desk audit concluded that plaintiff's position was correctly classified as an ITP-1. The audit report also concluded that CDHS human resources and management staff "did not mishandle this position allocation." Docket No. 61-21 at 2. In December 2007, plaintiff complained to DPA about the results of her desk audit. She claimed the desk audit did not properly investigate her claims of retaliation.

In February 2008, DPA asked Alan Ashurst, a supervisor in DPA's Division of Information Technology, to review an unsigned draft of plaintiff's PDQ dated January 17, 2008. Mr. Ashurst concluded that the PDQ looked "like a possible IT Pro II based on the decision making" required in the position. Docket No. 62-64. Mr. Ashurst later testified that plaintiff's February 2006 PDQ (which had been revised per Ms. Stahlberg's email) included the same job description regarding decision-making as the January 2008 draft PDQ and that based on this he would also have concluded that plaintiff's February 2006 PDQ qualified her for an ITP-2 reallocation. Docket No. 62-63 at 10-12.

In February 2008, plaintiff's supervisors drafted a "performance improvement plan" for plaintiff. In April 2008, additional duties were added to plaintiff's PDQ; however, her position was not reallocated upward. On April 15, 2008, Mr. Head and Mr. Rensel gave plaintiff a "Needs Improvement" performance evaluation. The evaluation narrative described her job knowledge as "minimal," criticized her for declining to be involved with any changes and/or updates to the system, and described her accountability as "negligent." The narrative also described plaintiff's communications to management as "confrontational" and her interactions with other staff as "strained" and "discourteous." Docket No. 62-66 at 2. Mr. Rensel also criticized plaintiff for failing to provide training to other employees. Plaintiff did train two other employees in her group,

but Mr. Rensel felt this training was not extensive.  On May 15, 2008, Mr. Head sent plaintiff a "staff planning document" outlining the performance expectations for her position and formulating a plan to have her meet those expectations.  Plaintiff initiated the dispute resolution process as to her evaluation.  Her supervisors later revised her evaluation to "meets expectations," while leaving the narrative with negative comments from the original evaluation.  Only this revised evaluation remained in plaintiff's personnel file.

In the spring of 2008, CDHS reviewed and revised all PDQs, including plaintiff's.  On April 30, 2008, plaintiff contested the classification of her position, arguing that new duties had been added to her PDQ.  Plaintiff was informed that her new duties were already included in the revised PDQ.  In June 2008, plaintiff emailed her supervisors again, wishing to know the status of her reallocation request.  Mr. Head responded by telling plaintiff that the issue had already been resolved in April 2008 and that there would be no further action on her request.

On April 21, 2008, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission, alleging age discrimination and retaliation for reporting age discrimination.  Plaintiff filed a whistleblower complaint with the state personnel board on July 2, 2008.  Plaintiff received positive mid-year 2008 and 2009 final performance evaluations.  Plaintiff filed her complaint in this case on May 1, 2009 [Docket No. 1].

## III.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

**IV. DISCUSSION**

Plaintiff originally brought five claims in her Amended Complaint [Docket No. 7], but voluntarily dismissed three of the five [Docket Nos. 16, 57]. Plaintiff's two remaining claims allege abridgement of her First Amendment freedom of speech pursuant to 42 U.S.C. § 1983 and age discrimination and unlawful retaliation pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq*.

**A. Freedom of Speech Retaliation Claim**

Plaintiff, a public employee, argues that her employer, a governmental entity, infringed on her First Amendment rights by retaliating against her because she exercised her First Amendment freedom of speech. "When a citizen enters government

service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Nevertheless, a citizen "who works for the government is nonetheless a citizen" and the First Amendment limits a government employer's ability to restrict its employees' speech. *Id.* at 419. Therefore, the court must balance a government employer's interest in restricting the speech of its employees and the employees' right to free speech, mindful that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

When balancing these competing interests, courts apply a test referred to as the *Garcetti/Pickering* analysis. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (citing *Garcetti*, 540 U.S. 410; *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). This analysis comprises five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). The first three of these steps are issues of law to be resolved by the Court, while the last two are ordinarily questions for the trier of fact. *Id.*

Defendants argue that plaintiff cannot carry her burden at steps two, four, and five of the *Garcetti/Pickering* analysis. Defendants also argue that plaintiff made many

of her alleged statements over two years before she filed suit and therefore her claim is partially barred by the two-year statute of limitations applicable in § 1983 actions. Because the Court finds as a matter of law that none of plaintiff's speech was on a matter of public concern, the Court need not reach the statute of limitations issue, the question of whether defendants Krivoruk or Ozga are entitled to qualified immunity, or whether plaintiff's allegedly protected speech was causally connected to the adverse employment actions plaintiff suffered.

In order to determine if an employee's speech is protected by the First Amendment, the court must determine whether the speech pertained to a public agency's "discharging its governmental responsibilities," and therefore a matter of public concern, or only related to "internal personnel disputes and working conditions." *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996). "In distinguishing between these two categories of speech, courts must consider the 'content, form, and context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Courts must also examine "the motive of the speaker to learn if the speech was calculated to redress personal grievances or to address a broader public purpose." *Workman v. Jordan*, 32 F.3d 475, 483 (10th Cir. 1994).

Here, plaintiff complained many times over a span of three years about a contractor at CDHS, Ms. Bennabhaktula, often stating that the payment of Ms. Bennabhaktula was a waste of taxpayer or public funds. Although the content of this statement appears to potentially relate to matters of public concern, its context reveals plaintiff's motive in making it was not that of a concerned citizen. *See David*, 101 F.3d

at 1355.  Plaintiff first raised this concern in April 2005, when Ms. Krivoruk told plaintiff she had been threatened by Mr. Chow, plaintiff's direct supervisor.  During this conversation, plaintiff took Mr. Chow's side, not believing that Mr. Chow had threatened Ms. Krivoruk and supporting Mr. Chow's account that Ms. Bennabhaktula was not performing as her contract required.  See Docket No. 62-1 at 7-9.  Plaintiff claims she told Ms. Krivoruk she believed keeping Ms. Bennabhaktula was a waste of money.  Id. at 11.  Soon after this conversation, plaintiff wrote Ms. Krivoruk an email explaining that she felt insulted by Ms. Bennabhaktula and expressing her feeling that Ms. Bennabhaktula was a dishonest person without dignity.  See Docket No. 61-15.

Plaintiff's April 2005 comments about Ms. Bennabhaktula clearly arose out of an internal workplace dispute.  That plaintiff linked her negative feelings about Ms. Bennabhaktula to the use of public funds is insufficient to transform plaintiff's workplace complaint into speech on a "matter of public concern."  See Connick, 461 U.S. at 149 ("To presume that all matters which transpire within a government office are of public concern would mean that every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case.").  Plaintiff's motive in her conversation with Ms. Krivoruk was not to speak out as a concerned citizen, but to redress her personal grievance and defend her supervisor, Mr. Chow.  See Workman, 32 F.3d at 483 (finding statement was not on a matter of public concern because plaintiff's motive for speech was to address grievance of a personal nature and reverse his termination).

Nor was plaintiff motivated to address a broader public purpose when she repeated this statement several times over the next three years.  In each instance,

plaintiff brought up Ms. Bennabhaktula in the context of her feeling retaliated against for having sided with Mr. Chow over Ms. Krivoruk. Plaintiff was not speaking out about a matter of general public concern – she was addressing her own feeling that she had been unfairly denied a promotion. *See id.* As the Supreme Court has explained, the First Amendment does not "constitutionalize the employee grievance." *Connick*, 461 U.S. at 154. Thus, none of plaintiff's statements were on a matter of public concern and defendants are entitled to summary judgment on plaintiff's first claim.

### B. Age Discrimination Claim

Plaintiff's amended complaint asserts a claim for discrimination and retaliation in violation of the ADEA against defendant Karen L. Beye, in her official capacity for prospective relief only. Docket No. 7 at 13. As defendants correctly state in their motion, where a plaintiff seeks prospective injunctive relief against a state official in her official capacity under the *Ex parte Young* doctrine, the court can only redress ongoing violations, not past wrongs. *See* Docket No. 61 at 31-32; *Frazier v. Simmons*, 254 F.3d 1247, 1253 n.2 (10th Cir. 2001). Thus, plaintiff does not dispute that her ADEA claim is restricted to defendants' decision not to reallocate her position in 2008 and her negative performance evaluation, as these are the only ongoing violations she has alleged. *See* Docket No. 7 at 32. The Court, therefore, need not consider earlier alleged instances of discrimination, or whether plaintiff is barred from basing her claims on them by virtue of her failure to exhaust her administrative remedies. *See id.* at 32-33; Docket No. 62 at 37. Because plaintiff claims defendants' decision not to reallocate her position upwards in the spring of 2008 and her negative performance reviews were both products of age

discrimination as well as unlawful retaliation for her reporting age discrimination, the Court will consider plaintiff's claims of discrimination and retaliation separately.

### 1. Age Discrimination

To prevail on her claim of age discrimination, plaintiff must show that age was a "but-for" cause of her alleged adverse employment actions, which in the Tenth Circuit requires showing that "age was the factor that made a difference" in the decision. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1277 (10th Cir. 2010). Where, as here, a plaintiff seeks to prove age discrimination by circumstantial evidence, the court must apply a three-step analysis referred to as the *McDonnell Douglas* framework. *See id.* at 1278. At step one, plaintiff must make a prima facie case showing that: "1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class." *Id.* at 1279 (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)). As to the fourth prong, plaintiff must also show that she was similarly situated to younger employees treated more favorably. *See Jackson v. NTMedia*, LLC, 233 F. App'x 770, 780 (10th Cir. 2006). At the summary judgment stage, if plaintiff presents sufficient evidence tending to prove her prima facie case, the burden shifts back to the defendants to provide legitimate, nondiscriminatory reasons for their employment decisions. *See Riggs v. AirTrain Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007). Once the employer articulates a legitimate reason for its action, the burden shifts back to the employee to produce evidence creating a genuine factual dispute as to whether the proffered justification was a pretext for discrimination. *Id.* at 1114-15.

Defendants argue plaintiff cannot meet elements three or four of her prima facie case, that is, she cannot show either that she was qualified for an ITP-2 position or that similarly situated younger employees were reallocated upward. *See* Docket No. 61 at 34. Alternatively, defendants argue that, even if plaintiff presents sufficient evidence to meet her prima facie case, they have proffered legitimate, non-discriminatory reasons for her alleged adverse employment actions and plaintiff cannot show these justifications are pretexts for age discrimination. *See* Docket No. 61 at 39-40.

Plaintiff offers sufficient evidence to create a genuine dispute of fact as to whether she was qualified for an ITP-2 position. *See* Docket Nos. 62-30 (email from Carol Stahlberg); 62-63 (deposition of Allen Ashurst). However, plaintiff does not cite to sufficient evidence that she was similarly situated to younger CDHS employees whose positions were reallocated during the relevant period or who did not receive negative performance reviews. Plaintiff argues that she was similarly situated to Bruce Rensel and Marina Drapkin, younger employees who both received upward reallocations (Rensel on October 1, 2007 and Drapkin on September 1, 2008). *See* Docket No. 62-53. However, plaintiff provides no evidence that she was similarly situated to these employees in all relevant respects. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."). First, plaintiff presents no evidence that Mr. Rensel and Ms. Drapkin held positions similar to plaintiff when they were reallocated. *McGowan v. City of Eufala*, 472 F.3d 736, 745-46 (10th Cir. 2006) (finding individuals who held different jobs were not similarly situated). In fact, plaintiff's evidence shows that Mr. Rensel and Ms.

Drapkin were both at higher ITP levels than plaintiff when they were reallocated.  *See* Docket Nos. 62-53, 62-69.  Furthermore, plaintiff's evidence also shows that Mr. Rensel and Ms. Drapkin supervised other employees, giving them significantly different job duties than plaintiff.  *See* Docket No. 62-69.  Plaintiff's evidence that Mr. Rensel and Ms. Drapkin reported to Ms. Krivoruk by itself is insufficient to show that they were similarly situated because, as the organizational chart submitted by plaintiff shows, by 2008 Ms. Krivoruk was at the top of the supervisory chain of all the employees in OITS.  *See* Docket No. 62-69.

Moreover, even if plaintiff had met her prima facie case, plaintiff does not present adequate evidence to discredit defendant's proffered nondiscriminatory justifications for the alleged adverse employment actions.  First, defendants claim plaintiff's group needed lower level support positions, such as plaintiff's, to function effectively and, therefore, they intended for her position to never be reallocated upward from the ITP-1 level.  Docket No. 61 at 6, 29.  Second, defendants claim they gave plaintiff a poor performance evaluation in April 2008 because she was, in fact, performing poorly.  *Id.* at 29-30.

No rational jury could find that these nondiscriminatory justifications are pretexts for age discrimination.  Plaintiff does not present sufficient evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).  The only evidence plaintiff submits suggesting that

defendants were acting out of discriminatory animus regarding her age is her supervisor's repeated inquiries as to her retirement plans. However, plaintiff's evidence shows the context of the retirement-related inquiries, revealing their appropriateness. Ms. Krivoruk initially asked plaintiff about her retirement plans before their falling out in 2005 while they were "friendly," but plaintiff did not perceive this inquiry to be veiled age discrimination. *See* Docket No. 70-8 at 21-24. Each subsequent time plaintiff was asked about her retirement plains, plaintiff had first raised the issue because she intended to retire within the next few years and was concerned her retirement pension would be reduced because she was not reallocated upwards. *See* Docket Nos. 70-8 at 15-17; 61-1 at 55-58, 59-60. These inquiries, taken in context, do not suggest defendants' non-discriminatory justifications were offered to cover up age discrimination. *Cf. Jones v. Okla. City Pub. Schs.*, 617 F.3d at 1276 (finding plaintiff presented evidence of pretext where she stated under oath that her superiors "made age-related comments regarding her retirement plans and that these comments occurred *outside the context of a normal conversation*.") (emphasis added).

### 2. Retaliation

Plaintiff argues that both the denial of her reallocation in 2008 and her poor performance review in April 2008 were retaliation for her complaints of age discrimination. In order to make out a prima facie case of retaliation, plaintiff must present evidence that: "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1215 (10th Cir. 2010) (quoting

*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007)).  Because no rational jury could find any causal connection between plaintiff's protected activity and her alleged adverse employment actions, the Court finds plaintiff cannot make out a prima facie case of retaliation.  As a result, the Court need not consider the other elements of her prima facie case.

Plaintiff made several complaints alleging age discrimination to various individuals between 2006 and 2008; however, plaintiff has no evidence that the two decisionmakers responsible for the denial of her allocation in 2008 and her negative performance review – Mr. Head and Mr. Rensel – were aware of any of these complaints when they made those decisions.  Plaintiff argues she told Mr. Head "her complaints about Ms. Krivoruk" in 2007, Docket No. 62 at 40.  But her affidavit and deposition indicate only that she told Mr. Head about "what was going on in 2005" and about her dispute with Ms. Krivoruk concerning Ms. Bennabhaktula, not about age discrimination.  *See* Docket Nos. 62-1 at 36, ll. 8-25; 62-48 at 2, ¶ 4.  Plaintiff also argues that Mr. Ozga told Ms. Krivoruk about plaintiff's letter to Ms. Beye alleging age discrimination.  Docket No. 62 at 40.  Yet plaintiff has no evidence to contradict Mr. Head's and Mr. Rensel's affidavits swearing that they were unaware of plaintiff's letter to Ms. Beye until after the alleged adverse employment actions.  *See* Docket Nos. 61-9 at 2, ¶ 5 (Head Aff.); 61-10 at 1, ¶ 3 (Rensel Aff.).  Nor does plaintiff cite any evidence suggesting that Mr. Head or Mr. Rensel were aware of plaintiff's complaint to Mr. Huston in August 2006 that Ms. Krivoruk was discriminating against her based on her age.  *See* Docket No 61 at 40.  Because plaintiff cites no facts suggesting a causal connection between any of her protected activity and her adverse employment actions

in 2008, defendants are entitled to summary judgment on plaintiff's retaliation claim. *See Johnson*, 594 F.3d at 1216.

## V.  CONCLUSION

For the foregoing reasons, it is

ORDERED that the motion for summary judgment [Docket No. 61] filed by defendants Beye, Krivoruk and Ozga is GRANTED. Judgment shall enter in favor of defendants and against plaintiff.  It is further

ORDERED that the trial preparation conference scheduled for January 21, 2011 and the trial scheduled to begin on February 7, 2011 are VACATED.


DATED December 29, 2010.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge